IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | |
|---|---|
| JOSEPH HENDERSON, | 1:25-CV-00285-SPB |
| Plaintiff | SUSAN PARADISE BAXTER<br>Unite States District Judge |
| vs. | RICHARD A. LANZILLO<br>Chief United States Magistrate Judge |
| BROCK GRICE, STEVEN P. MATSON, NICHOLAS SPURGEON, JOHN DOE(S), | REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT |
| Defendants | RE: ECF NO. 14 |

I. RECOMMENDATION

Defendants Brock Grice, Steven P. Matson, and Nicholas Spurgeon's motion to dismiss or alternatively for summary judgment is before the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636. ECF No. 14. For the reasons explained below, Defendants' motion should be considered solely under Fed. R. Civ. P. 56 and granted in part and denied in part.

II. REPORT

A. Background and Relevant Procedural History

Plaintiff Joseph Henderson ("Henderson") commenced this action pursuant to 42 U.S.C. § 1983 against three officers of the City of Erie Police Department, Brock Grice ("Grice"), Steven P. Matson ("Matson"), and Nicholas Spurgeon ("Spurgeon"). Henderson claims that the Defendants violated his rights under the Fourth

Amendment when, during their response to a 911 emergency call, they forcibly entered his residence without a warrant and, upon entry, allegedly used excessive force to subdue and arrest him. *See* ECF No. 1, *generally*. Defendants have moved to dismiss his Complaint, or alternatively, for summary judgment (ECF No. 14). The parties have filed concise statements of material fact with supporting appendices and briefs.[1] Because Defendants' motion requires consideration of materials beyond the Complaint, including audio/visual recordings of the incident at issue, the Court will treat the motion entirely as one for summary judgment under Fed. R. Civ. P. 56.

B. Standard of Review

Federal Rule of Civil Procedure 56(a) requires the district court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving

[1] *See* ECF No. 15 (Defendants' brief); ECF No. 16 (Defendants' concise statement); ECF No. 17 (Defendants' audio/visual exhibits); ECF No. 21 (Henderson's brief); ECF No. 22 (Henderson's responsive concise statement); ECF No. 23 (Henderson's appendix).

party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993); C*lement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Furthermore, where the events at issue have been captured on video, the court must view the facts as depicted in the video when determining whether any genuine issue of fact remains for trial. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (relying on a video recording in assessing summary judgment evidence and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").

C. Material Facts[2] and Claims

On September 27, 2023, at approximately 1:30 a.m., a 911 call was received from Henderson's residence at 826 Pennsylvania Avenue in Erie, Pennsylvania, reporting a domestic disturbance or incident at that location. City of Erie Police Officers, including Defendants Grice, Matson, and Spurgeon, responded to the call. The actions of the officers and their verbal exchanges with Henderson and the female caller at the scene were recorded on the body cameras of various officers. During the incident, Henderson referred to the female as "Danielle." The same designation will be used in this Report.

Officer Vogel was the first to arrive at Henderson's residence. He knocked on Henderson's door but received no response. ECF No. 17, Exhibit B, 00:47. He radioed to dispatch to ask the dispatcher to call the residence and request that the occupants open the door. Officer Vogel again knocked on Henderson's door as Officer Grice arrived at the scene. *Id*. 3:26. Voices are heard from inside the residence. *Id*. 3:43. Officer Vogel and Officer Grice continued knocking on the door while announcing that they were from the Erie Police. *Id*. 4:14-4:36. A female voice from inside the residence is heard stating, "He won't let me open the door." *Id*. 4:45. Officer Grice announced again that he was with the Erie Police and demanded the door be opened or he would "boot the door in." *Id*. 4:48. A barking dog and muffled undiscernible conversations are heard from inside the residence. *Id*. 4:51-5:25. Officer Vogel

[2] The material facts are taken from the parties' concise statements of material facts (ECF Nos. 16, 22), as well as the exhibits submitted by the Defendants and Henderson (ECF Nos. 17, 23). Disputed facts are noted.

reported over the radio to dispatch, "They're arguing in the stairwell. We are trying to get one of them to answer." *Id.* 5:22. Grice again knocked on the door with his flashlight and announced, "Erie Police, open the door or I'm gonna boot it in." *Id.* 5:27. More indistinct talking is heard, with voices becoming louder. *Id.* 5:27-6:00. Grice again knocked on the door with his flashlight and stated, "Erie Police, we're not leaving, open the door." *Id.* 6:10. He again warned that if the door was not opened, he would force it open. At the same time, Officer Vogel unsuccessfully attempted to open the door using the door handle. *Id.* 6:37.

Henderson is heard from inside the residence stating, "you're not gonna boot the door in." *Id.* 6:38. Grice responded that he would, to which Henderson replied, "no, you're not. I have a dog up here." *Id.* 6:40-42. Grice then asked, "How about you open the door and speak to me like a normal human?" *Id.* More indistinct conversation is heard from inside the residence behind the door. *Id.* 6:43-7:06. After Henderson continued to refuse to open the door, Officer Grice attempted to force the door by kicking it multiple times. At this point, Henderson yelled, "don't break the door." *Id.* 7:13-30. From inside the residence, Danielle is heard asking Henderson, "why are you acting like this then?" *Id.* 7:52. Henderson then stated, "I'm going to bed, I'm going to bed, please stop. I'm going to bed." *Id.* 8:12. Henderson then asked Danielle to "tell them to go." *Id.* 8:26-36. She responded that "they won't go" and that "her daughter is right here." *Id.* Grice again kicked the door. Henderson then yelled "you break down my door, I'll take you to court!" At the same time, Danielle screamed. *Id.* 8:49. Moments later, Henderson and Danielle are heard continuing to

argue, and Henderson is heard repeatedly urging her to send the police away. *Id.* 9:07-10:07. Screams from Danielle are periodically heard among the raised voices from inside the apartment.

Shortly thereafter, Officer Lucas DeHart successfully opened a wooden door leading into what appeared to be a storage area adjacent to the stairwell to Henderson's apartment. *Id.* 10:09. Officers attempted to gain access to Henderson's stairwell, but the door separating the storage room from the stairwell was locked. *Id.* 10:15. Henderson is heard saying, "Danielle, they are coming from there! Tell em to stop, tell em to fucking stop," to which she responded, "why are you acting like this?" *Id.* 10:15-20. Grice again kicked the front entrance door of the residence, and Henderson yelled, "I want to go to bed!" *Id.* 10:28-46. Another officer again tried the entrance door handle, and Danielle stated, "I'm right here," and then screamed. *Id.* 10:53-55. Henderson then yelled, "Danielle! Stop! Stop! Danielle stop! Danielle stop! What the fuck are you talking about man?" *Id.* 11:00.

Grice again shouted, "somebody open the door," while Henderson and Danielle continued to argue. *Id.* 11:19. Other officers pulled on the handle of the storage room door and eventually gained access to the stairway. The officers then ordered Henderson, "Get out, right here, now." *Id.* 12:10. The officers then reached into the stairwell and pulled Henderson into the storage area. *Id.* Henderson protested, "I'm in my own home." *Id.* The officers forced Henderson face down onto the floor of the stairwell while Henderson shouted "Danielle" several times and threatened to sue the officers. *Id.* 12:22-29. Officers repeatedly instructed Henderson to "put [his]

hands behind [his] back," while Danielle pleaded, "Joe, listen to them." *Id*. 12:42. When Henderson continued to resist, an officer cautioned Henderson that he was going to deploy a taser unless Henderson followed the officer's instructions. ECF No. 17, Exhibit D, 9:12. A few seconds later, the officer issued a final warning before Defendant Spurgeon tased Henderson in the back of his left thigh. *Id*. 12:53; ECF No. 17, Exhibit E, 0:13-20. Officers continued to struggle to secure the handcuffs on Henderson while instructing him, "just put your hands behind your back." *Id*. Exhibit B, 13:15.

At this point in the incident, both of Henderson's arms had been manipulated behind his back but he was continuing to resist any attempt to secure his wrists with handcuffs. *Id*. Henderson maintains that Matson next delivered several blows to his head or shoulders, but the video footage is inconclusive in this regard because of the movement of the camera and bodies blocking the view.[3] *Id*. Exhibit D, 00:09:53-00:10:00. Shortly thereafter, however, Grice can be seen kneeing Henderson three times in the torso while attempting to help secure the handcuffs on Henderson's left wrist. *Id*. Exhibit E, 0:30-33; ECF No. 17, Exhibit D, 00:09:52. The officers then secured the handcuffs and stepped away from Henderson. ECF No. 17, Exhibit B, 00:13:35; *Id*. Exhibit D, 00:10:03.

Henderson, now secured, can be heard saying "I'm gonna sue the fuck out of you" and asking, "why you got to do that to me?" ECF No. 17, Exhibit B, 13:55. One officer responded, "you should've opened the door," and Grice can be heard saying,

---

[3] Specifically, while the camera shakes vigorously for several seconds at the time pinpointed by Henderson, indicating some sort of rapid movement, it is impossible to tell what that movement might be.

"you act like a normal human and it won't happen buddy." *Id.* 14:00. Henderson replied, "act like a human? You just beat me like a fucking ape." *Id.* 14:04. Henderson then asked, "why you gone kick me with steel toe boots in the face?" *Id.* 14:22. Grice checked Danielle's condition. *Id.* 14:25. Henderson continued yelling as the officers escorted him to the police vehicle repeating phrases like "this is happening to me" and "y'all gone kill me?" *Id.* 14:44; ECF No. 23, Exhibit 2, 3:12-3:57.

Immediately following the incident, Henderson was transported to UPMC Hamot Hospital for treatment of injuries sustained during his arrest. ECF No. 22 ¶ 142. Henderson's medical records note "obvious swelling to his right orbit as well as dried blood from the nose and a small puncture wound to the bridge of his nose." *Id.* His records further indicate that his right eye was swollen shut and that he was diagnosed with "acute bilateral nasal bone fractures." *Id.* Henderson maintains that he suffers from ongoing light sensitivity, headaches, and difficulty with his vision because of these injuries. *Id.* ¶ 145.

Following his arrest, Henderson was charged with Simple Assault, Harassment, False Imprisonment, Disorderly Conduct, and Resisting Arrest or other Law Enforcement. ECF No. 16 ¶ 125; ECF No. 22 ¶ 125. The Resisting Arrest charge was waived over to the Court of Common Pleas. *Id.* ¶ 126. Henderson proceeded to trial and was found guilty of Resisting Arrest and sentenced to a term of six months' probation. *Id.* ¶¶ 127-128.

Henderson's Complaint asserts two claims against Defendants: Count I, excessive force in violation of the Fourth Amendment against all defendants; and Count II, assault and battery under Pennsylvania state law against all Defendants.

D. Discussion and Analysis

1. Defendants' warrantless forced entry into the residence was constitutional.

"The Fourth Amendment ordinarily requires that police officers get a warrant before entering a home without permission." *Lange v. California*, 594 U.S. 295, 298 (2021). "But an officer may make a warrantless entry when 'the exigencies of the situation' create a compelling law enforcement need." *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 460 (2011)). In determining whether a warrantless entry was "objectively reasonable" based on the exigencies of the situation, courts must consider the "totality of the circumstances." *Case v. Montana*, 607 U.S. 107, 118 (2026) (citing *Barnes v. Felix*, 605 U.S. 73, 80 (2025); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)). An action is reasonable if the circumstances, viewed objectively, justify the action. The officer's subjective motivation is irrelevant. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006).

Exigent circumstances under which law enforcement officers may reasonably enter a home without a warrant include to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. *Brigham City*, 547 U.S. at 403. A 911 dispatch call indicating that a domestic disturbance is in progress at a residence will often establish the existence of exigent circumstances unless circumstances at the residence indicate that warrantless entry is unnecessary.

*United States v. Wadley*, No. CR.07-166, 2007 WL 4593508, at *5 n. 9 (W.D. Pa. Dec. 28, 2007) (citing *Daniels v. County of Media*, 2001 WL 487859, at *3 n. 3 (E.D.Pa.2001)). This is because domestic disputes are particularly "combustible" and prone to "explode" into violence without warning. *United States v. Martinez*, 406 F.3d 1160, 1164–1165 (9th Cir.2005); *Fletcher v. Town of Clinton*, 196 F.3d 41, 50 (1st Cir.1999); *Tierney v. Davidson*, 133 F.3d 189, 197 (2d Cir.1998). *See also United States v. Torres*, 534 F.3d 207, 212 (3d Cir. 2008) (noting that people "could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process") (quoting *United States v. Sanchez*, 519 F.3d 1208, 1211 n.1 (10th Cir. 2008)). Therefore, courts have accorded great latitude to an officer's belief that a warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger. *Martinez*, 406 F.3d at 1165 (quoting *Tierney*, 133 F.3d at 197); *accord Fletcher*, 196 F.3d at 50.

This Court and others within the Third Circuit have repeatedly found circumstances comparable to those faced by Defendants in this case sufficient to justify warrantless entries. In *Wadley*, this Court found that the police officers' warrantless entry was reasonable where 911 calls reported a domestic dispute and a hostage situation, and police officers heard yelling and screaming from the home. 2007 WL 4593508, at *6. Although the Court "decline[d] to hold that a 911 emergency call reporting domestic violence per se provides for a finding of exigent circumstances, [it found] that the police officers' entry into the home was plainly reasonable based

on the totality of the circumstances" they confronted. *Id.* In *United States v. Holyfield*, 2005 WL 2106624, (W.D. Pa. August 26, 2005), this Court found a warrantless entry reasonable where officers responded to a domestic violence call, heard arguing inside the apartment, and observed a man attempting to leave the apartment through a rear window. In *Daniels v. County of Media*, 2001 WL 487859 (E.D. Pa. February 28, 2001), the district court found a warrantless entry reasonable where police officers responded to a 911 call reporting a domestic disturbance and observed the intoxicated husband in a heated conversation with his wife. Similarly, in *McNeil v. City of Easton*, 694 F. Supp. 2d 375, 389 (E.D. Pa. 2010), the district court concluded that officers reasonably entered a residence after an anonymous 911 caller reported suspected domestic violence and officers arrived to hear "a woman screaming and loud banging" coming from inside the home.

In this case, Defendants responded to a 911 emergency call that they reasonably understood involved a domestic disturbance. Upon arrival, Officer Vogel and Officer Grice repeatedly knocked on the door of the residence and announced that they were from the Erie Police. They repeatedly implored Henderson or Danielle to open the door. Vogel radioed the dispatcher and requested that he call the residence to request that someone open the door to allow officers to ascertain the status and safety of the 911 caller inside. Danielle advised the officers through the locked door, "He won't let me open the door." Raised voices, arguing, and an occasional scream were heard from inside the residence. At one point, Danielle indicated that her daughter was also present inside the residence. These circumstances objectively

supported a belief that the occupants of the residence were in physical peril or were being held against their will. Henderson's repeated refusals to open the door to the residence and his barring Danielle from doing so made it impossible for officers to secure the safety of the occupants without forced entry.

The totality of circumstances, as recorded on the Defendant officers' body cameras, objectively established the existence of exigent circumstances and a compelling law enforcement need to force entry into Henderson's residence. Therefore, to the extent Henderson bases his Fourth Amendment claim on the Defendants' forced entry into his residence, Defendants are entitled to judgment as a matter of law, and their motion for summary judgment should be granted as to this aspect of Henderson's Fourth Amendment claim.

2. Although the reasonableness of most of the force used by officers to arrest Henderson is supported by the current record, genuine issues of material fact remain as to the reasonableness of Grice and Matson's alleged punches or kicks to Henderson's head and face.

Henderson alleges that Defendants used excessive force when they forcibly removed him from his residence, took him to the ground, tased him, and struck him while placing him in handcuffs. "To prevail on a Fourth Amendment excessive-force claim, a plaintiff must show that a seizure occurred and that it was unreasonable under the circumstances." *Lamont v. New Jersey*, 637 F.3d 177, 182-83 (3d Cir. 2011). No dispute exists regarding Defendants' seizure of Henderson. *See Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004) (holding "[a] seizure occurs '[w]henever an officer restrains the freedom of a person to walk away'") (alteration in original)

(quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)). The question is whether it was reasonable.

Whether a particular use of force is reasonable "turns on the facts and circumstances of each particular case" evaluated "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Spada v. Houghton*, 2024 WL 4784382, at *2 (3d Cir. Nov. 14, 2024) (*quoting Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)). "[T]he standard is whether the police officer's 'actions [were] objectively reasonable in light of the facts and circumstances' ..., regardless of the officer's intent or motivation." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). Application of this standard is guided by several factors, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The court also assesses the physical injury to the plaintiff, "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997), *abrogated on other grounds by Curley v. Klem*, 499 F.3d 199, 209-11 (3d Cir. 2007).

Regarding "the severity of the crime at issue" and "whether the suspect poses an immediate threat to the safety of the officers or others," Henderson focuses

exclusively on the time after officers extracted him from his residence. This focus is too narrow. The totality of circumstances faced by Defendants included their interactions and observations from the outset of their response to the 911 call. As discussed above, the officers encountered a situation that immediately raised concerns for the safety of the 911 caller and potentially others present in the residence. Henderson's repeated refusals to open the door to allow them to ascertain the safety of the occupants, Danielle's declaration that Henderson would not allow her to open the door, and an ongoing argument and occasional scream from inside the residence supported an objectively reasonable conclusion that Henderson posed an immediate threat to the occupants of the residence. When officers ultimately gained access to the stairwell, Henderson repeatedly refused to comply with officers' commands to open the door or exit the residence.

Once officers entered the stairwell, Henderson again defied their commands to exit his apartment and immediately began to resist their efforts to gain physical control of him. This noncompliance and resistance forced the officers to physically pull Henderson into the storage area and bring him to the ground to secure him. The body-camera recording makes clear that, after Henderson was face down on the ground, officers repeatedly instructed him to place his hands behind his back. Rather than immediately complying, Henderson continued to resist officers' attempts to remove his hands from beneath his body and secure them with handcuffs. Officers repeatedly instructed Henderson to "[p]ut [his] hands behind [his] back" before warning him that continued noncompliance would result in use of a taser. Even after

the taser deployment, officers remained unable to secure Henderson's left arm until Defendant Grice delivered three knee strikes to his torso while assisting the other officers in bringing Henderson's arm behind his back so that handcuffs could be applied.

Considering the totality of the circumstances, the initial decision to pull Henderson from the stairwell and take him to the ground was objectively reasonable. The officers had just entered a confined area and observed evidence of an active domestic disturbance, including shouting, arguing, and screams from a female occupant. Henderson's repeated refusal to obey commands to cooperate necessitated the officers' actions to secure him quickly and determine whether Danielle or anyone else inside the residence required assistance. Under those circumstances, taking Henderson to the ground to gain control of the situation was an objectively reasonable use of force.

Likewise, Defendant Spurgeon's taser use was objectively reasonable. The video evidence establishes that officers repeatedly instructed Henderson to place his hands behind his back before issuing a final warning that he would be tased if he failed to comply. Henderson nevertheless continued resisting the officers' efforts to secure his arms beneath him. Multiple courts of appeals had approved of the use of taser guns to subdue individuals who resist arrest or refuse to comply with police orders. The reasonableness of use of a taser to subdue or induce compliance of an individual physically resisting arrest or otherwise posing a danger to officers is well-established. *See Brown v. Cwynar*, 484 Fed. Appx. 676, 681 (3d Cir. 2012) (citing

*Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir.2004) (holding the use of a taser to "effectuate [an] arrest" was reasonable when the individual was "hostile, belligerent, and uncooperative"); *Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir.1993) (approving the use a stun gun to overcome a suspect's resistance of arrest); *Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir.1992) (holding it was reasonable to use a taser to subdue a paranoid schizophrenic who locked himself in an apartment and disobeyed police orders to open the door and drop his weapons)). From the perspective of a reasonable officer in the circumstances presented, Henderson's refusal to surrender his hands represented active resistance to efforts to safely gain control over his movements and justified Spurgeon's brief use of his taser to induce his compliance.

Similarly, Defendant Grice's knee strikes occurred while officers were actively attempting to secure Henderson's left arm and complete the handcuffing process. At the time of the strikes, officers had managed to manipulate both of Henderson's arms so that they were behind his back but had not been able to pull his hands together to secure the cuffs. The video reflects that the strikes were delivered during this ongoing struggle in an apparent attempt to break the stalemate rather than after Henderson had been restrained. None of the knee strikes occurred after officers had successfully secured the handcuffs. Under those circumstances, the use of targeted knee strikes to overcome Henderson's resistance to being cuffed was an objectively reasonable use of force.

But the record does not permit a similar finding as a matter of law with respect to Henderson's claim that Defendant Grice and Defendant Matson gratuitously kicked or punched him in the head and face at some point during the altercation. Henderson asserts that "Defendant Grice struck [him] in the head and/or face multiple times with closed fists as multiple officers are on top of [him] and [he] was defenseless." ECF No. 22, ¶ 133 (citing ECF 23-1, at 2:46). Henderson also asserts that "Defendant Matson struck [him] in the head and face multiple times with a closed fist while [he] was defenseless on the ground." *Id.* ¶ 136 (citing ECF 23-1, at 3:01). The video evidence also shows that in the aftermath of the altercation, Henderson stated that Grice kicked him in the face with "steel-toed boots." ECF No. 17, at 14:22. Henderson repeated this allegation upon his arrival at the hospital. ECF No. 22 ¶ 142. Because the body camera recording shakes violently at critical moments, suggesting possible rapid and violent movement, it is not conclusive of whether Grice and/or Matson kicked or punched Henderson in the head or face after officers had fully gained control over him, and force ceased to be necessary. *Id.* Additionally, Henderson points to evidence that he sustained injuries to his head and neck during the encounter – an area of his body that was not targeted by the lawful applications of force discussed above. After Henderson was escorted to the patrol vehicle, an officer remarked that Henderson was "bleeding from the mouth." ECF No. 23-2, Exhibit 2, at 3:57. Henderson's medical records and prison intake photos corroborate these allegations with depictions of injuries including a swollen eye and broken nose. While the existence of an injury alone does not establish that the force

used was constitutionally excessive, the presence of injuries in a location that officers did not need to target to secure Henderson's arms in cuffs is consistent with his averment that Grice and Matson used the chaos of the incident to maliciously kick or punch him in the head and face. Because the present record presents genuine issues of material facts regarding this aspect of Henderson's Fourth Amendment claim, it should be permitted to proceed to discovery and further consideration upon a more fully developed record.[4]

In summary, no reasonable jury viewing the clear portions of the video record could conclude that the force used to extract Henderson from the stairwell and secure him in handcuffs was objectively unreasonable. This reasonable force included officers' taking Henderson to the ground, Spurgeon's administering a taser to his thigh, and Grice's knee strikes. Each was objectively reasonable and proportionate to Henderson's noncompliance and resistance and the officers' need to secure him for their protection and the protection of Danielle. Accordingly, Defendants are entitled to judgment as a matter of law as to those portions of Henderson's Fourth Amendment excessive force claim. But genuine issues of material fact remain and preclude summary judgment regarding Henderson's claim that Grice and Matson punched or kicked him in the head and face without justification.

[4] Although Henderson's conviction for resisting arrest supports the reasonableness of some level of force against him, it does not fully preclude his excessive force claim based on Grice and Matson's alleged striking him in the head and face. *See Nelson v. Jashurek*, 109 F.3d 142 (3d Cir.1997). In *Nelson*, the Court of Appeals for the Third Circuit upheld a § 1983 action for excessive force despite the plaintiff's underlying conviction for resisting arrest. The Court reasoned that "the fact that [defendant] was justified in using 'substantial force' to arrest [plaintiff] does not mean that he was justified in using an excessive amount of force ...." *Id*. at 145-46.

3. Genuine issues of material fact preclude summary judgment for Grice and Matson based on qualified immunity.

Defendants also argue that they are entitled to qualified immunity. Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[5] *Sharrar v. Felsing*, 128 F.3d 810, 826 (3d Cir. 1997) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity operates to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). This doctrine protects public officials "from undue interference with their duties and from potentially disabling threats of liability." *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005). The availability of the qualified immunity affirmative defense turns on two separate but related issues: (1) whether the plaintiff has adduced facts sufficient to "make out a violation of a constitutional right," and (2) "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). When conducting this two-part inquiry, a court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first "in light of the circumstances of the particular case at hand." *Id*. at 236. Of course, the court only needs to determine whether the right was clearly established

[5] "The burden of establishing qualified immunity falls to the official claiming it as a defense." *Burns v. PA Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011). *See also*, *Harris v. Kellogg, Brown & Root Servs., Inc.*, 2016 WL 4720058, at *1 (W.D. Pa. Sept. 9, 2016) (noting that the defendant "has the burden of proof on its affirmative defense of qualified immunity"); *Pruchnic v. Wright*, 2016 WL 1267812, at *10 (W.D. Pa. Mar. 30, 2016) (same).

at the time of the challenged conduct if a constitutional violation is established. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).

As discussed, Henderson has failed to establish a violation of his Fourth Amendment rights as to the Defendants' warrantless entry into his residence, Defendants' taking Henderson to the ground, Spurgeon's use of his taser, and Grice's knee strikes during the handcuffing process. As to these aspects of Defendants' use of force, no further qualified immunity analysis is necessary. But to the extent the current record is insufficient to determine whether Grice and Matson gratuitously punched or kicked Henderson in the head or face, the violation-of-constitutional-right component of qualified immunity will have to await a more developed record.

Nevertheless, it is appropriate that the Court reach the "clearly established" component of the analysis. *See Pearson*, 555 U.S. at 236 (holding that a court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first "in light of the circumstances of the particular case at hand"). A finding that the right at issue was not clearly established at the time of the incident would spare the defendants the cost and disruption of discovery and other proceedings to resolve the disputed issues of fact associated with the constitutional-violation component.

"'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018) (cleaned up) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)) (additional citation omitted). "In other

words, existing law must have placed the constitutionality of the officer's conduct 'beyond debate.'" *Id.* "This inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*) (internal quotation marks omitted). "Rather, the right at issue must be framed 'in a more particularized, and hence more relevant, sense." *Estep v. Mackey*, 639 Fed. Appx. 870, 873 (3d Cir. 2016) (quoting *Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015)); *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (the court must first identify the right "at the appropriate level of specificity"). In other words, the right must be defined based on the facts and circumstances faced by the government official as alleged by the plaintiff. *See Rivas-Villegas*, 142 S. Ct. at 8; *al-Kidd*, 563 U.S. at 742; *Estep*, 639 Fed. Appx. at 873.

Once the court has identified the asserted right at the appropriate level of specificity, it then looks first to Supreme Court decisions to determine whether the right was clearly established at the time of the conduct at issue. *See Mammaro v. N.J. Div. of Child Protection and Permanency*, 814 F.3d 164, 169 (3d Cir. 2016). Absent factually similar Supreme Court precedent, a court may rely on a "'robust consensus of cases of persuasive authority' in the Court[s] of Appeals." *Taylor v. Barkes*, 575 U.S. 822, 826 (2015) (*per curiam*).

Defined based on Henderson's specific allegations and assertions, the constitutional right underlying Henderson's surviving claim against Grice and Matson is the right to be free from blows to the head and face inflicted by arresting

police officers after an arrestee is restrained. This right had been clearly established by a robust consensus of decisions of the courts of appeals long before the incident at issue in this case. *See, e.g., Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir.2009) ("[A]t the time of the incident in 2001, it was established that an officer may not kick or otherwise use gratuitous force against an inmate who has been subdued."); *Blazek v. City of Iowa City*, 761 F.3d 920, 925 (8th Cir.2014) ("It was clearly established in 2009 that when a person is subdued and restrained with handcuffs, a "gratuitous and completely unnecessary act of violence" is unreasonable and violates the Fourth Amendment."); *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 404 (6th Cir.2009) ("This Court has consistently held in light of the reasonableness standard that 'use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.'" (quoting *Baker v. City of Hamilton*, 471 F.3d 601, 607–08 (6th Cir.2006))); *Jennings v. Jones*, 499 F.3d 2, 16–17 (1st Cir.2007) (holding that reasonable officer should have known that it was unconstitutional to increase the use of physical force after an arrestee who had been resisting arrest stops resisting and warns officers that they are hurting him). Therefore, based on the disputed issues of fact that remain under the current record, Grice and Matson are not entitled to qualified immunity on Henderson's claim that they punched or kicked him in the head and face. Grice and Matson may reassert their qualified immunity defense, if appropriate, following further development of the record.

4. Defendants are entitled to judgment as a matter of law on Henderson's assault and battery claim except to the extent this claim is based on Grice and Matson's alleged kicks or punches to Henderson's head.

Under Pennsylvania law, "[a]ssault is an intentional attempt by force to do an injury to the person of another, and a battery is committed whenever the violence menaced in an assault is actually done, though in ever so small a degree, upon the person." *Renk v. City of Pittsburgh,* 537 Pa. 68, 641 A.2d 289, 293 (1994) (quoting *Cohen v. Lit Brothers,* 166 Pa.Super. 206, 70 A.2d 419, 421 (1950)). In making a lawful arrest the police may use "such force as is necessary under the circumstances to effectuate the arrest." *Id.* Thus, the "reasonableness of the force determines whether the police officer's conduct constitutes an assault and battery", *id.* and so "[a] claim brought under Pennsylvania law for excessive force by a police officer is a claim for assault and battery." *Garey v. Borough of Quakertown,* 2012 WL 3562450, at *5 (E.D. Pa. Aug. 20, 2012) (internal quotations omitted).

Although governmental employees generally enjoy statutory immunity, a governmental employee loses that immunity if the court determines that the employee's act constituted "a crime, actual fraud, actual malice or willful misconduct." 42 Pa. Cons. Stat. Ann. § 8550. In an action for assault and battery, an officer may be liable "if it is shown not just that he acted intentionally, but also that the officer knew that the force used was not reasonable under the circumstances." *Debellis v. Kulp,* 166 F. Supp.2d 255, 279 (E.D. Pa. 2001) (citing *Renk,* 641 A.2d at 293–94). In this respect, judicial consideration of a state law assault and battery claim largely parallels consideration of a Fourth Amendment excessive force claim.

It is well-settled Pennsylvania law that a police officer is justified when making an arrest in committing what would otherwise be an assault or battery, provided the force used is reasonable. *See Commonwealth v. Jayne,* 11 Pa. Super. 459 (1899). As discussed in the above analysis of Henderson's § 1983 excessive force claim under the Fourth Amendment, no reasonable jury could find that the force used to extract Henderson from the residence and secure him in handcuffs, including officers' taking Henderson to the ground, Spurgeon's use of a taser, and Grice's knee strikes, was unreasonable. This conclusion also applies to preclude Henderson's state law assault and battery claim based on the same uses of force. Accordingly, Defendants are entitled to judgment as a matter of law as to those portions of Henderson's assault and battery claim. But as with Henderson's Fourth Amendment claim, genuine issues of material fact remain and preclude summary judgment regarding Henderson's claim that Grice and Matson punched or kicked him in the head and face without justification. This aspect of Henderson's assault and battery claim should survive pending development of the record.

E. Conclusion

For the foregoing reasons, it is respectfully recommended that Defendants' motion for summary judgment be granted in part and denied in part. The motion should be denied to the extent Henderson's § 1983 Fourth Amendment excessive force claim and state law assault and battery claim are based on Defendant Grice and Defendant Matson's alleged punching or kicking Henderson in the head and face. The motion should be granted in all other respects. Judgment should be entered in

favor of Defendant Spurgeon pursuant to Fed. R. Civ. P. 58, and he should be terminated as a party to this action.

## III. NOTICE

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72((b)(2), and Local Rule 72(D)(2), the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. *Brightwell v. Lehman*, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72(D)(2).

DATED this 20th day of August, 2026.

RESPECTFULLY SUBMITTED:

RICHARD A. LANZILLO
CHIEF UNITED STATES MAGISTRATE JUDGE